**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
David A. Nelson (IL 6209623; *pro hac vice*)
davidnelson@quinnemanuel.com
Athena D. Dalton (IL 6326790; *pro hac vice*)
athenadalton@quinnemanuel.com
Harrison Rose (IL 6327523; *pro hac vice*)
harrisonrose@quinnemanuel.com
Luiz Miranda (IL 6328766; *pro hac vice*)
luizmiranda@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Tel: (312) 705-7400

Alexander Rudis (NY Bar No. 4232591; *pro hac vice*)
alexanderrudis@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849 7000

Jeff Gerchick (DC Bar No. 474529; *pro hac vice*)
jeffgerchick@quinnemanuel.com
1300 I Street NW Suite 900
Washington, D.C. 20005
Tel: (202) 538 8000

Andrew M. Holmes (Bar No. 260475)
drewholmes@quinnemanuel.com
Ognjen Zivojnovic (Bar No. 307801)
ogizivojnovic@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Tel: (415) 875-6600

Justin Sorensen (Bar No. 324817)
justinsorensen@quinnemanuel.com
2755 E Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Tel: (801) 515-7320

**GISH PLLC**
Ryan Iwahashi (CA SBN 284766)
ryan@gishpllc.com
50 California Street, Suite 1500
San Francisco, CA 94111
Phone: (415) 630-2000

Andrew D. Gish (NY SBN 4918454; *pro hac vice*)
andrew@gishpllc.com
Christopher Gerson (NY SBN 4595708; *pro hac vice*)
chris.gerson@gishpllc.com
Josef Schenker (NY SBN 4935185; *pro hac vice*)
josef.schenker@gishpllc.com
41 Madison Avenue, Floor 31
New York, NY 10010
Phone: (212) 518-7380

*Attorneys for Fortinet, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FORTINET, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>NETSKOPE, INC.,<br><br>Defendant. | Case No. 4:26-cv-08886-HSG<br><br>**FORTINET, INC.'S COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Fortinet, Inc. ("Fortinet"), by and through its undersigned counsel, brings these claims for patent infringement against Defendant Netskope, Inc. ("Netskope") and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action for infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

2. Fortinet was founded in 2000 with a mission to innovate, develop, and provide sophisticated cybersecurity protection for business and enterprise customers. Fortinet has long been known as a pioneer and industry leader in the cybersecurity space. As such, Fortinet has placed a substantive focus on technology and product development throughout its history.

3. By virtue of its focus on innovation, Fortinet has become the top-grossing cybersecurity company in many regions, building the best and most complete suite of products to protect enterprise customers. Millions of customers currently trust, and have trusted, Fortinet's security offerings and their underlying innovative technologies. And Fortinet's focus on innovation and development of industry-leading security products has led to a world-class patent portfolio with nearly 1,500 issued patents, including more than 1,100 in the United States and 295 additional patent applications pending, each representing novel technological inventions.

4. Netskope, on the other hand, is a relative newcomer to the security technology marketplace, having been founded ten years after Fortinet. Netskope has publicly stated it has around 1,500 customers.

5. Fortinet is committed to protecting its intellectual property. Fortinet does not take litigation lightly. Throughout its history, Fortinet engaged in litigation on only a few occasions when Fortinet felt it necessary to protect its intellectual property. Fortinet prefers to avoid litigation and instead to work in good faith with infringers to address their unauthorized use of Fortinet's patented technologies.

6. Accordingly, on October 22, 2021, Fortinet attempted to initiate licensing discussions with Netskope, with the good faith objective to engage in business discussions to reach an amicable business agreement to resolve Netskope's infringement.

7. Thereafter, Fortinet continued to engage with Netskope, including correspondence throughout December 2021, continuing through April 2022. Despite the parties' extensive correspondence regarding Netskope's infringement and Fortinet's offer of a license, Netskope provided a single response offering only a fraction of the value of Fortinet's patents to resolve its infringement. Netskope then filed a declaratory judgment action of non-infringement against Fortinet, in Case No. 3:22-cv-01852-TLT ("Netskope I"). Thus, while Fortinet preferred to reach an amicable resolution to Netskope's infringement without court intervention, Netskope has forced Fortinet's hand and the need to seek a solution through judicial means.

8. Beyond its declaratory judgment action, Netskope has further provoked litigation through its purchase and assertion against Fortinet of a patent portfolio from RPX Corporation. These patents, currently asserted against Fortinet in Case No. 4:25-cv-02360-HSG ("Netskope II"), are not technologies developed by Netskope. Nonetheless, by continuing to press the issue of litigation against Fortinet, Netskope has forced Fortinet's hand by confirming that Netskope has no intention of respecting Fortinet's rights in its intellectual property. As such, Fortinet filed counterclaims in the Netskope II action—asserting Fortinet's U.S. Patent No. 11,449,623 (the "'623 patent"), U.S. Patent No. 11,290,527 (the "'527 patent"), U.S. Patent No. 12,126,695 (the "'695 patent"), and U.S. Patent No. 12,244,621 (the "'621 patent") (collectively, "the Asserted Patents")—to further protect its intellectual property and to stop Netskope's infringement.

9. Despite Netskope being aware of its infringement of the Asserted Patents, Netskope has continued to disregard Fortinet's intellectual property rights by continuing to use, make, offer to sell, sell, and/or import the Accused Products in the United States.

10. On March 27, 2026, the parties filed a stipulation with proposed order to sever Fortinet's counterclaims in Netskope II into a new action. On August 18, 2026, the Court ordered the Clerk to open a new case with a separate case number for Fortinet's counterclaims. *See* Netskope II Dkt. 185. The Court also ordered Fortinet to file an amended complaint in this case with its counterclaims. *Id*. Pursuant to the Court's Order, Fortinet files its complaint of infringement to further protect its intellectual property and to stop Netskope's infringement.

11. Specifically, as addressed in greater detail below, Netskope has infringed and continues to infringe each of the Asserted Patents.

12. Fortinet is the legal owner of the Asserted Patents, which were duly and legally issued by the United States Patent and Trademark Office. Fortinet seeks injunctive relief and money damages.

## THE PARTIES

13. Fortinet, Inc. is a Delaware corporation with its principal place of business at 909 Kifer Road, Sunnyvale, California 94086-5205.

14. Upon information and belief and as alleged in Netskope's Complaint in Netskope II, Netskope is a Delaware corporation with its principal place of business at 2445 Augustine Drive, Suite 301, Santa Clara, California 95054.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

16. This Court has personal jurisdiction over Netskope in this action at least because Netskope submitted to the jurisdiction of this Court when it filed its Complaint in Netskope II and because Netskope has committed acts of patent infringement and has regularly and systematically conducted and solicited business in this District by and through at least its headquarters in this District.

17. Venue is proper in this District under 28 U.S.C. § 1400(b) at least because Netskope has committed acts of infringement in this District and has regular and established places of business in this District, specifically its headquarters at 2445 Augustine Drive, Suite 301, Santa Clara, California 95054.

## FACTUAL BACKGROUND

### Fortinet's History of Innovation

18. Founded in Palo Alto, California, in 2000 by serial entrepreneurs and technology visionaries Ken and Michael Xie, Fortinet is one of the world's leading providers and innovators of network security technologies, including deep security protection technology, with over a million

customers worldwide, including enterprises, carriers, data centers, distributed offices, and governments. Fortinet currently has over 15,000 employees worldwide—including thousands engaged in the research and development of new and existing technologies—and has shipped over seventeen million units to over a million customers globally. Fortinet's inventions form the core of modern network, fabric, and cloud security technology and enable modern, secure business communications around the world. Fortinet's products and services provide broad, integrated, and high-performance protection against cybersecurity threats while simplifying information technology security infrastructures.

19. Fortinet is a cybersecurity industry-leader, in part, because of its holistic approach to network security, its culture of innovation, and its dedication to researching and developing new technologies to address the ever-evolving needs of modern businesses and networking. From the technologies used to define and manage networks, to the cloud, to deep security protection, to threat detection, prevention, and prediction, to security processors, Fortinet has led and continues to lead the market in both software and hardware advancements. Over the past 25 years, Fortinet has invested substantial resources researching and developing its technologies, technical strategies, and business plans related to its cybersecurity products and services through the expenditure of considerable employee work hours and company resources. Fortinet is undeniably a company focused on substantive innovation for the benefit of its customers. Fortinet's founders themselves have engineering backgrounds. Fortinet has also engaged in acquisition and integration of other innovative companies in a strategic manner to further balance and expand its product offerings and technology portfolio.

20. Since its founding, one of Fortinet's core focuses has been designing, developing, and improving network security systems to protect businesses from cyberattacks. Fortinet is a pioneer in network security systems—both on-premises and via the cloud—which enable modern, secure business communications. Fortinet's "FortiGate" cloud-based software and appliances, for example, detect and eliminate the most damaging, content-based cyber threats from email and web traffic without degrading network performance. The wide range of innovations pioneered by Fortinet in this space, including DLP, traffic management technologies, cloud security, and

integration with sandboxing, remain a cornerstone of all network security, whether deployed on-premises or in the cloud. By integrating the industry's broadest suite of deep security protection technology, the FortiGate systems allow Fortinet customers to obtain the most comprehensive security solutions. And the industry has recognized Fortinet's pioneering efforts year after year. Indeed, Fortinet has won dozens of awards for its network security innovations,[1] including as a "Magic Quadrant" Leader for Network Firewalls (and other security areas).[2] Fortinet is also a pioneer in Secure Access Service Edge, or SASE. SASE is the convergence of security and networking. With networks expanding beyond the wide area network (WAN) edge to thin branch networks and the cloud, traditional hub and spoke infrastructure models centered around the corporate data center begin to break down. Fortinet's pioneering technology in this space supports dynamic, secure Internet access for a "work from anywhere" workforce, including by allowing a company to define a virtual network that is not dictated by the physical location of its employees. Fortinet also pioneered technologies for securing data stored via a cloud storage service, including scanning and encrypting such data. The integration of Fortinet's network technology with Fortinet's security fabric thus provides large enterprises with continuous visibility and access control technology for securing even the most sophisticated network.

21. The breadth of Fortinet's innovation is reflected in its patent portfolio, including the four Asserted Patents. The Asserted Patents cover a broad range of core technologies on security, processing, and routing features. Fortinet's industry-leading research and development efforts—

---

[1] *E.g.*, *Fortinet Industry Awards*, (available at https://www.fortinet.com/corporate/about-us/industry-awards.html).

[2] *Fortinet Recognized as a Leader in the Gartner Magic Quadrant for Network Firewalls, Recognized for the Twelfth Time* (Nov. 8, 2021), (available at https://www.fortinet.com/corporate/about-us/newsroom/press-releases/2021/fortinet-named-leader-2021-gartner-magic-quadrant-for-network-firewalls); *Fortinet Recognized as a Leader in the 2025 Gartner Magic Quadrant for SASE Platforms* (July 15, 2025) (available at https://www.fortinet.com/corporate/about-us/newsroom/press-releases/2025/fortinet-recognized-as-a-leader-in-the-2025-gartner-mq-for-sase-platforms); and *Fortinet Named a Leader in the 2025 Gartner Magic Quadrant for Hybrid Mesh Firewall* (available at https://www.fortinet.com/corporate/about-us/newsroom/press-releases/2025/fortinet-named-a-leader-in-the-2025-gartner-magic-quadrant-for-hybrid-mesh-firewall); *Gartner Magic Quadrant Reports*, (available at https://www.fortinet.com/solutions/gartner-magic-quadrants).

together with smart acquisitions of other innovative companies—have resulted in a world-class patent portfolio, with nearly 1,500 patents issued, with another 295 patent applications pending.

22. Fortinet's patents cover key features of Netskope's product offerings that are important to Netskope's customers. Netskope cannot simply redesign its platform without forgoing the benefits of Fortinet's patents. Doing so would risk degrading Netskope's customers' experience and/or decreasing efficiency in Netskope's product offerings.

23. For example, Netskope touts its Data Loss Prevention capabilities as the "industry's most comprehensive and most advanced cloud DLP solution [that] secures sensitive data consistently everywhere across the entire enterprise"[3] and its "Behavior Analytics, which detects unknown threats by analyzing five types of user traffic across web, apps, cloud services, shadow IT, and public-facing custom apps."[4] But those capabilities are based on Netskope's infringement of at least Fortinet's '623 patent. Similarly, Netskope's Cloud Security Posture Management (CSPM) services are based on its infringement of at least Fortinet's '527 patent. Netskope also consistently advertises and touts the Cloud Threat Exchange and related threat detection and protection services.[5] But Netskope is offering those services by infringing at least Fortinet's '695 patent. Similarly, Netskope advertises its Netskope Shadow IT, Cloud Access Security Broker (CASB) products and services by infringing the '621 patent. These critical capabilities are provided by Fortinet's patented technology.

24. It is not reasonably practical for Netskope to simply disable its data loss, behavioral analytics, and threat protection features; terminate its cloud security, CSPM, and Cloud Threat Exchange offerings; or prevent its users from utilizing the Netskope Shadow IT and CASB services of its platform. Thus, the features enabled by Fortinet's patented technology are important to Netskope's business. Netskope must reasonably compensate Fortinet for its use of Fortinet's valuable intellectual property.

---

3 https://www.netskope.com/products/data-loss-prevention.

4 https://www.netskope.com/resources/data-sheets/netskope-behavior-analytics.

5 https://www.netskope.com/press-releases/netskope-cloud-threat-exchange.

## THE ASSERTED PATENTS

25. United States Patent No. 11,449,623 (the "'623 patent") issued on September 20, 2022, and is titled "File access control based on analysis of user behavior patterns." Matthew J. Little, Jamie R. Graves, and Carson Leonard are the named inventors. Fortinet is the original and current owner by assignment of the '623 patent. A true and correct copy of the '623 patent is attached hereto as Exhibit 1.

26. United States Patent No. 11,290,527 (the "'527 patent") issued on March 29, 2022, and is titled "Automatic tagging of cloud resources for implementing security policies." Ignacio Franzoni Martinez and Joan Ruiz Sanchez are the named inventors. Fortinet is the original and current owner by assignment of the '527 patent. A true and correct copy of the '527 patent is attached hereto as Exhibit 2.

27. United States Patent No. 12,126,695 (the "'695 patent") issued on October 22, 2024, and is titled "Enhancing security of a cloud deployment based on learnings from other cloud deployments." Úlfar Erlingsson and Yijou Chen are the named inventors. Fortinet is the original and current owner by assignment of the '695 patent. A true and correct copy of the '695 patent is attached hereto as Exhibit 3.

28. United States Patent No. 12,244,621 (the "'621 patent") issued on March 4, 2025, and is titled "Using activity monitored by multiple data sources to identify shadow systems." Vikram Kapoor, Harish Kumar Bharat Singh, Weifei Zeng, Vimalkumar Jeyakumar, Theron Tock, Ying Xie, and Yijou Chen are the named inventors. Fortinet is the original and current owner by assignment of the '621 patent. A true and correct copy of the '621 patent is attached hereto as Exhibit 4.

29. Together, the '623, '527, '695, and '621 patents form the Asserted Patents.

## ACTS GIVING RISE TO THIS ACTION

30. The allegations provided below are exemplary and without prejudice to Fortinet's infringement contentions. In providing these allegations, Fortinet does not convey or imply any particular claim construction or the precise scope of the claims. Fortinet's claim construction

contentions regarding the meaning and scope of the claim terms will be provided under the Court's scheduling order and local rules.

31. The infringing Netskope products include, but are not limited to, the products and services identified below for each Asserted Patent in Counts I-IV.

32. As set forth in more detail below, each element of at least one claim of each of the Asserted Patents is literally present in the Accused Products. To the extent that any element is not literally present or practiced, each such element is present or practiced under the doctrine of equivalents.

33. Netskope has made extensive use of Fortinet's patented technologies, including the technology described and claimed in the Asserted Patents. Fortinet has no choice but to defend its proprietary and patented technology.

**COUNT ONE: INFRINGEMENT OF PATENT NO. 11,449,623**

34. Fortinet re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs of these claims as though fully set forth herein.

35. Fortinet is the current exclusive owner and assignee of all right, title, and interest in and to the '623 patent, duly and legally issued by the United States Patent and Trademark Office, including the right to bring this suit for damages. *See* Exhibit 1.

36. The '623 patent is valid and enforceable.

37. Netskope has directly infringed and continues to infringe the '623 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the '623 patent, including but not limited to the Netskope Behavior Analytics (such as Netskope Basic UBA, Standard UBA, Advanced UBA, and UEBA), Netskope Data Loss Prevention (DLP), Netskope Encryption (or Netskope Active Encryption), Netskope Digital Experience Management (DEM), and related Netskope products and services that are part of the Netskope Platform and/or Netskope Security Cloud (the "'623 Accused Products"). *See* Exhibit 5.

38. As a non-limiting example, Netskope has infringed at least claim 1 of the '623 patent. Claim 1 claims as follows:

1. A method comprising:

obtaining and storing, by one or more servers associated with an enterprise network, information regarding historical user behavior of a plurality of users of the enterprise network by observing file access requests initiated by the plurality of users;

receiving, by the one or more servers, a file access request initiated by a first user of the plurality of users, wherein the file access request relates to a file stored within the enterprise network in encrypted form;

responsive to receipt of the file access request, determining, by the one or more servers, a risk score for the first user based on a plurality of factors, including information regarding historical user behavior, the file access request and observed data determined based on the file access request; and

based on the risk score, permitting or denying, by the one or more servers, access to the file by returning a decryption key for the file or withholding the decryption key wherein said permitting or denying comprises:

when the risk score is less than a first threshold, returning the decryption key and providing full access to the file;

when the risk score is greater than a second threshold, withholding the decryption key; and

when the risk score is between the first threshold and the second threshold, returning the decryption key and providing limited access to the file.

39. The ’623 Accused Products practice “obtaining and storing, by one or more servers associated with an enterprise network, information regarding historical user behavior of a plurality of users of the enterprise network by observing file access requests initiated by the plurality of users.” For example, Netskope’s Platform and/or Netskope Security Cloud obtains and stores, by

one or more servers associated with an enterprise network, information regarding historical user behavior of a plurality of users of the enterprise network through the use of "Behavior Analytics."[6]




40. For example, "[t]he Behavior Analytics User Confidence Index page displays the top risky users based on their User Confidence Index. Admins will access this page to view details for each user."[7] The Behavior Analytics Confidence Incident includes information on "Behavior Analytics Policy: Lists the policy you enabled that triggered the incident."[8] An "Incident Description: List a short description of the incident that triggered the policy." *Id.*

[6] https://www.netskope.com/wp-content/uploads/2022/10/2025-01-DLP-DS-10-14-2.pdf; https://docs.netskope.com/en/behavior-analytics-incidents

[7] https://docs.netskope.com/en/behavior-analytics-user-confidence-index/

[8] https://docs.netskope.com/en/behavior-analytics-incidents




41. Netskope's platform has the capability to track file access requests through audit logs. For example, Netskope's audit logs track: Access Denied, Login Failed, SSO Login Failed, Admin logged out because of successive login failures, Login Successful, SSO Login Successful.[9] "The filters allow you to search the log for activities based on severity, log type, and whether or not the user is Netskope personnel."[10]

42. As explained by Netskope's documentation, "[t]he fields that are in display will vary based on the policy that triggered the event. A policy triggers when a policy interval and threshold are met. The fields you see, such as email, source, location, device, etc. are attributes of the last event which met the conditions to trigger the policy. For example, if a policy is created to alert if a user downloads 100 files in five minutes, then the information displayed is for the 100th event that occurred within the five minutes."[11]

---

[9] https://docs.netskope.com/en/audit-log-1

[10] *Id.*

[11] https://docs.netskope.com/en/behavior-analytics-incident-details




43. "Combining key network and security capabilities, Netskope One continues to revolutionize the effectiveness of enterprise network infrastructure and operations (I&O) and security teams, enabling the entire organization to optimize the user experience while protecting critical data and reducing risk, cost, and complexity."[12]

[12] https://www.netskope.com/press-releases/netskope-advances-netskope-one-platform-with-ai-driven-proactive-dem-solution-key-security-innovations

# Netskope Advances Netskope One Platform With AI-Driven Proactive DEM Solution, Key Security Innovations

***Network Visibility and Control, Advanced Evasive Threat Detection, Context-Aware Zero Trust Integrations Accelerate Cloud Networking and Security Operations***

**SANTA CLARA, Calif. – September 10, 2024 –** Netskope, a leader in Secure Access Service Edge (SASE), today announced several new innovations in the Netskope One platform, including expanded digital experience management (DEM) features and benefits. Combining key network and security capabilities, Netskope One continues to revolutionize the effectiveness of enterprise network infrastructure and operations (I&O) and security teams, enabling the entire organization to optimize the user experience while protecting critical data and reducing risk, cost, and complexity.

Coming on the heels of Netskope being recognized as a Leader in the 2024 Gartner Magic Quadrant™ for Single-Vendor SASE and as a Leader in the 2024 Gartner Magic Quadrant for Security Service Edge, the newly announced Netskope One platform advancements include the following.

44. The ’623 Accused Products practice “receiving, by the one or more servers, a file access request initiated by a first user of the plurality of users, wherein the file access request relates to a file stored within the enterprise network in encrypted form.” Netskope’s servers receive file access requests from users related to files stored within their enterprise network in encrypted form. For example, Netskope provides security solutions for encrypted file hosting and access.[13]

[13] https://docs.netskope.com/de/encryption-and-tokenization-features; https://docs.netskope.com/en/create-a-policy-to-find-encrypted-or-password-protected-files/

netskope

Data Sheet

# Netskope Encryption



**QUICK GLANCE**

- Powerful, additional layer of protection for sensitive data in the cloud
- Protects both structured and unstructured data in cloud services
- Safeguards data at rest in sanctioned cloud services like Office 365 and Salesforce
- Real-time protection of data in transit to cloud services
- Key management options to maintain customer control of encryption keys

Organizations are rapidly adopting the cloud for collaboration and sharing, but data stored in cloud services without adequate protection can be inadvertently or maliciously exposed. Netskope Encryption provides powerful, added protection for data in the cloud.

**PRODUCT OVERVIEW**

Even with inherent security capabilities integrated into many cloud services, your sensitive data can still be exposed in the cloud. Netskope Encryption provides a powerful, additional layer of protection to safeguard your sensitive data in the cloud and ensure its confidentiality and privacy. Netskope provides advanced encryption, tokenization and key management technology to protect both structured and unstructured data, and can also use advanced DLP to selectively encrypt your most sensitive content. Netskope Encryption operates automatically and is transparent to end users, seamlessly encrypting and decrypting data behind the scenes.

- Netskope uses advanced technology, including NIST-approved AES-256 encryption and a FIPS 140-2 level 3 certified key management service with a hardware security module
- Encrypts unstructured data with an AES-256 key that is unique to each file

## Netskope Features

| FEATURES | DESCRIPTION |
|---|---|
| **Advanced, highly secure encryption and key management technologies** | • Advanced Encryption Standard 256-bit (AES-256) keys ensure data confidentiality and integrity<br>• Highly secure, fault tolerant key management service (KMS) with hardware security module (HSM) that is FIPS 140-2 Level 3 certified<br>• Complies with Key Management Interoperability Protocol (KMIP) to integrate with existing key management services to allow organizations to retain control of their encryption keys |
| **Encryption of structured and unstructured data** | • Encrypt structured data at rest or in real time in sanctioned services through Netskope-native format-preserving encryption<br>• Leverage pre-built integrations with cloud service provider bring your own key (BYOK) capabilities<br>• Encrypt unstructured data at rest in sanctioned services or in real-time activities using an AES-256 key that is unique to each file |
| **Tokenization of structured data** | • Tokenize data in sanctioned services through Netskope-native formatted-field tokenization |
| **Protection of data in transit to cloud services and also stored in sanctioned cloud services** | • Apply encryption inline, automatically encrypting and decrypting data as it moves in and out of cloud services<br>• Encryption can also be applied as a policy action with API protection, encrypting selected files stored in sanctioned cloud services like Office 365 and Box |
| **Selective encryption using advanced DLP and deep cloud context** | • Netskope DLP is the most advanced in the industry with capabilities including 3,000+ data identifiers, support for 1,000+ file types, custom regular expressions, proximity analysis, international support using double-byte characters, fingerprinting, exact match and optical character recognition (OCR).<br>• Detailed contextual information such as user, group, device, location, and activity can be used to further tailor encryption policies |
| **Automatic, transparent encryption service with full access control** | • Encryption and decryption happen automatically and transparently behind the scenes<br>• Access control policies can be applied to decrypt data based on criteria such as user, group, location, and device<br>• No change in end user behavior needed, nor any impact on end user experience |

### Create a policy to find encrypted or password protected files

| Prerequisites for the API protection use cases | Roles/actors in the use cases |
|---|---|
| • Tenant creation<br>• User accounts created<br>• CASB API Protection connected to CSP (Cloud Service Provider) | • CSP (Cloud Service Provider) administrator<br>• Cloud governance team<br>• Security Analyst |

To create a DLP policy for an API protected service that takes action based on finding encrypted or password protected files, follow the steps shown below:

1. Navigate to Policies > API Data protection > New Policy.
2. Select the API protected service for which the DLP policy is required.
3. Under the Users section, select 'All Users'.
4. Under Content section, select 'All sharing options' and 'All file types'.
5. Under DLP, select the pre-defined DLP profile on password protected files.
6. Under Action, select the action to be taken as per the requirement.



45. The ’623 Accused Products practice “responsive to receipt of the file access request, determining, by the one or more servers, a risk score for the first user based on a plurality of factors, including information regarding historical user behavior, the file access request and observed data determined based on the file access request.” For example, responsive to receipt of file access requests, Netskope’s servers determine a risk score for users based on a plurality of factors, including information regarding historical user behavior, the file access request, and observed data determined based on the file access request. For example, Netskope’s platform utilizes “User Confidence Index in Policies - User Confidence is an additional source (traffic criteria) for Real-time Protection policies. Policies are defined using a set of variables. These variables define the criteria for detecting policy violations,” including detecting “strange access” scenarios such as compromised credentials.[14]

An example of what this type of alert looks like is shown below. It shows that our demo user reached a UCI of 322 (which is poor), and the Key Detection Scenario around the drop is, “**Compromised credential – Strange access**.”

Uba
Alert Name: UCI threshold alert
Acknowledged: false
Action: None

GENERAL

CreatedTime: 1691346961286
Event Type: uba_analytics
Scenario: Compromised credential - Strange access
WindowId: 1691280000000
Type: nspolicy
Alert Generated: yes
Alert ID: 8eb77dca4ee1510c497ead57

USER

User: demo@company.com
Group:
Device: Other
User Key: demo@company.com
Normalized: demo@company.com

SESSION

# Total Events: 1

BEHAVIOR ANALYTICS

User Confidence Index: 322

[14] https://www.netskope.com/blog/operationalizing-advanced-ueba-detection-scenarios-and-uci-alerts; https://docs.netskope.com/en/behavior-analytics-user-confidence-index

46. The ’623 Accused Products practice “based on the risk score, permitting or denying, by the one or more servers, access to the file by returning a decryption key for the file or withholding the decryption key wherein said permitting or denying comprises when the risk score is less than a first threshold, returning the decryption key and providing full access to the file; when the risk score is greater than a second threshold, withholding the decryption key; and when the risk score is between the first threshold and the second threshold, returning the decryption key and providing limited access to the file.” For example, based on the risk score, Netskope’s servers control permission to allow or deny certain access to files by returning a decryption key for the file or withholding the decryption key depending on a risk score threshold. Netskope’s platform allows for creating real-time protection policies in response to a score. As explained: “When you create a Real-time Protection policy with Access Method defined for a domain that’s also part of an SSL Do Not Decrypt policy, Real-time Protection policy evaluation still takes place. If this Real-time Protection policy’s action is Block, then the domain will be blocked. As a workaround, Netskope recommends that you create a custom category for the domains in the SSL policy, and then create a Real-time Protection policy with Allow as the action for this custom category. Ensure to place this policy above the policy that blocks domains.”[15]

> **Tip**
>
> When you create a Real-time Protection policy with Access Method defined for a domain that’s also part of an SSL Do Not Decrypt policy, Real-time Protection policy evaluation still takes place. If this Real-time Protection policy’s action is Block, then the domain will be blocked.As a workaround, Netskope recommends that you create a custom category for the domains in the SSL policy, and then create a Real-time Protection policy with Allow as the action for this custom category. Ensure to place this policy above the policy that blocks domains.

[15] https://docs.netskope.com/en/inline-policies; https://docs.netskope.com/en/add-a-policy-for-ssl-decryption/; https://docs.netskope.com/de/encryption-and-tokenization-features; https://docs.netskope.com/en/user-confidence-index-in-policies; https://www.netskope.com/wp-content/uploads/2023/05/advanced-ueba-case-studies.pdf.



# Protecting Data in the Cloud with Encryption

Jul 08 2014 | 2 min. read

By Rajneesh Chopra

Share this article

Earlier this year, we announced our intention to deliver context-aware encryption for enterprise cloud apps. It is our pleasure to introduce Netskope Active Encryption, the industry's only solution that protects data in fine-grained context, including user group, location, device, app or category, activity, and content. Unlike solutions for which encryption in the cloud is an all-or-nothing proposition, Netskope lets you narrow the aperture of data that needs protection so you can target the real risks in your organization without having to necessarily encrypt everything.

Netskope Active Encryption uses AES 256-bit encryption for data-at-rest that are being uploaded to, downloaded from, or discovered within cloud apps. In addition to having fine-grained contextual controls available in the Netskope Active Platform, customers can also enable encryption for content that matches the organization's data loss prevention (DLP) profile, including personally-identifiable information, electronic personal health information, payment card information, profanity, and even custom regular expressions defined by the organization.

Request Demo

Tags

Cloud Best Practices

Cloud Encryption

Data Loss Prevention Software

Tools and Tips

Word on the Street





When you select User Confidence as a traffic criteria, you're making your policy more specific based on the confidence threshold.

Click in the User Confidence text box to set the threshold.



47. Netskope's platform can be configured such that a user has limited access to a file based on UCI. "Standard UEBA: Includes sequential anomaly rules to detect cloud app bulk data uploads, downloads, deletes, plus proximity, failed logins, shared credentials, rare events, risky countries, and data exfiltration between company and personal app instances."[16] "Advanced UEBA:

[16] https://www.netskope.com/wp-content/uploads/2026/03/2026-03-Behavior-Analytics-DS-512-4.pdf

Includes Standard UEBA, with the added ability to customize sequential rules, plus 65+ machine learning (ML) based anomaly detection models for insiders, compromised accounts and devices, and data exfiltration use cases. Advanced UEBA also includes 180+ detectors, including inline, API, and private access." *Id*. "User Confidence Index (UCI): Included with Advanced UEBA, UCI provides user risk scoring and event correlation timelines with the ability to invoke policy actions based on score, and a REST API for UCI export. UCI is key to detecting insiders with alert and event correlation on data activity and movement." *Id*. "Adaptive Policy Controls: Leverage UCI scores for adaptive policy controls, including step-up authentication, realtime coaching, justifications, limiting activity, or blocking based on other policy variables including data sensitivity and app risk." *Id*.

48. Netskope has been aware of the '623 patent since at least November 21, 2025. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102.

49. Netskope has actively and willfully induced infringement of at least claim 1 of the '623 patent since at least November 21, 2025, in violation of 35 U.S.C. § 271(b).

50. Netskope's customers and end-users of the '623 Accused Products directly infringe at least claim 1 of the '623 patent, at least by using the '623 Accused Products, as described above.

51. Since at least November 21, 2025, Netskope has knowingly induced infringement of at least claim 1 of the '623 patent by customers and end-users of the '623 Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and use of the '623 Accused Products in the United States.

52. Netskope instructs customers and end-users, at least through its marketing, promotional, and instructional materials, to use the infringing '623 Accused Products, as described in detail above. Netskope creates and distributes promotional and product literature for the '623 Accused Products that is designed to instruct, encourage, enable, and facilitate use of the '623 Accused Products in a manner that directly infringes the '623 patent. In particular, Netskope instructs end users on how to configure and use its UEBA service and/or product such that a user

has limited access to a file based on the User Confidence Index associated with that user, as described above.

53. Netskope provides its customers and end-users with additional instructions that direct their customers and end-users to use the ’623 Accused Products in an infringing manner. Such instructions include, for example, data sheets, technical specifications, customer support services, product sheets, and technical support services.

54. Netskope contributed and is contributing to infringement of at least claim 1 of the ’623 patent, in violation of 35 U.S.C. § 271(c).

55. Netskope’s customers and end-users of the ’623 Accused Products directly infringe at least claim 1 of the ’623 patent, at least by using the ’623 Accused Products, as described in detail above.

56. Netskope contributes to infringement of the ’623 patent by offering to sell and selling in the United States the ’623 Accused Products and components thereof, including, for example, the ’623 Accused Products and associated software applications, hardware, and other services. Such components are substantial, material parts of the claimed inventions of the ’623 patent and have no substantial non-infringing use. The only use of Netskope’s ’623 Accused Products is using the UEBA products and/or services to monitor and control users’ access to one or more files based on factors that include a numerical index (*e.g.*, a User Confidence Index or UCI).

57. The ’623 Accused Products and associated software applications, firmware, and other services supplied by Netskope are specially made and adapted for use in infringing the ’623 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use. Thus, the subroutines and functionality of the ’623 Accused Products, including at least the software and/or firmware used for the UCI and associated operations and functionalities of UEBA, have no purpose other than to practice the claimed invention.

58. This description is based on publicly available information and a reasonable investigation of the structure and operation of Netskope’s products and services. Fortinet reserves the right to modify or supplement this description, including, for example, on the basis of information about Netskope’s products and services that it obtains during discovery.

59. Netskope is not, and has never been, licensed or otherwise authorized by Fortinet to practice the claims of the ’623 patent.

60. Netskope’s infringement has harmed and continues to harm Fortinet in an amount yet to be determined. Fortinet is entitled to relief from this harm in the form of at least a reasonable royalty and/or the lost profits that Fortinet would have made but for Netskope’s acts of infringement.

61. As of at least November 21, 2025, Netskope has had actual knowledge of the ’623 patent and Netskope’s infringement thereof. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102. Thus, Netskope’s ongoing infringement of the ’623 patent has been willful.

62. Despite Netskope’s knowledge of the ’623 patent and its infringement thereof, Netskope has continued to make, use, sell, offer for sale, and/or import into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the ’623 patent, including but not limited to the Netskope ’623 Accused Products.

63. Netskope’s conduct in infringing the ’623 patent continues.

**COUNT TWO: INFRINGEMENT OF PATENT NO. 11,290,527**

64. Fortinet re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs of these claims as though fully set forth herein.

65. Fortinet is the current exclusive owner and assignee of all right, title, and interest in and to the ’527 patent, duly and legally issued by the United States Patent and Trademark Office, including the right to bring this suit for damages. *See* Exhibit 2.

66. The ’527 patent is valid and enforceable.

67. Netskope has directly infringed and continues to infringe the ’527 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the ’527 patent, including but not limited to Netskope’s Cloud Security Posture Management (“CSPM”), Auto-Remediation Framework, Netskope One Orchestrator, and related products and services (the “’527 Accused Products”). *See* Exhibit 6.

68. As a non-limiting example, Netskope has infringed at least claim 1 of the ’527 patent. Claim 1 claims as follows:

> 1. A method comprising:
>
> receiving, by a cloud-tagging orchestrator service running on a security manager associated with a private network, information regarding each cloud provider of a plurality of cloud providers associated with a cloud environment used by the private network; and
>
> based on the received information, for each cloud resource of a plurality of cloud resources hosted by the plurality of cloud providers on behalf of the private network:
>
> retrieving, by the cloud-tagging orchestrator service, information associated with the cloud resource;
>
> identifying, by the cloud-tagging orchestrator service, a unified tag of a plurality of unified tags for the cloud resource based on a pre-defined global tagging policy; and
>
> assigning, by the cloud-tagging orchestrator service, the unified tag to the cloud resource via an application programming interface (API) of a cloud provider of the plurality of cloud providers hosting the resource.

69. The ’527 Accused Products practice “receiving, by a cloud-tagging orchestrator service running on a security manager associated with a private network, information regarding each cloud provider of a plurality of cloud providers associated with a cloud environment used by the private network.” For example, Netskope CSPM operates as a comprehensive method-based system: “Cloud Security Posture Management (CSPM) is a Netskope service that provides an organization insight into the security posture of their public cloud resources. CSPM utilizes Netskope's API-enabled controls and real-time protection capabilities to continuously assess public cloud

deployments for policy violations."[17] The CSPM service embodies systematic cloud resource management through structured operational frameworks. *Id*.




70. In addition, the Auto-Remediation Framework implements systematic approaches: "Netskope auto-Remediation solution for AWS deploys the set of AWS Lambda functions that query

[17] https://www.netskope.com/security-defined/cspm-cloud-security-posture-management

the above Netskope API on the scheduled intervals and mitigate supported violations automatically," demonstrating methodical, systematic automated processes for cloud resource management.[18] Further, "[t]he continuous security assessment monitors and audits GCP configurations and uses the CIS benchmark and GCP best practices to identify misconfigurations and provide guided remediation steps" extending systematic approaches across multiple cloud platforms.[19]

71. The '527 Accused Products practice "based on the received information, for each cloud resource of a plurality of cloud resources hosted by the plurality of cloud providers on behalf of the private network: retrieving, by the cloud-tagging orchestrator service, information associated with the cloud resource; identifying, by the cloud-tagging orchestrator service, a unified tag of a plurality of unified tags for the cloud resource based on a pre-defined global tagging policy; and assigning, by the cloud-tagging orchestrator service, the unified tag to the cloud resource via an application programming interface (API) of a cloud provider of the plurality of cloud providers hosting the resource." For example, the CSPM Individual Resource Processing "[p]rovides a detailed inventory page for each resource, where you can see how many alerts have been generated by each resource, as well as the detailed configuration details for each resource" demonstrating individual resource processing capabilities.[20] The Auto-Remediation Per-Resource Operations framework operates on individual resources: "GetNetskopeCSPMResults Lambda function has been triggered by the CloudWatch scheduled rule and retrieved corresponding violation from the Netskope API," and processes individual violations for specific resources, demonstrating resource-by-resource processing.[21] This includes granular asset analysis, where CSPM identifies assets that live within cloud infrastructures and classifies how they are currently configured with individual asset classification. *Id.*

---

18 https://github.com/netskopeoss/CSPM-AWS-AutoRemediation
19 https://www.netskope.com/blog/introducing-continuous-security-assessment-for-google-cloud-platform
20 https://www.netskope.com/solutions/aws-azure-gcp
21 https://community.netskope.com/security-posture- management-4/cspm-security-violation-findings-auto- remediation-for-aws-5844




72. In addition, the CSPM Advanced Tag Policy Framework includes use cases for label policy enforcement to ensure that resources are labeled appropriately. "For example, if we want to ensure that every EC2 instance in our AWS Cloud carries a label named 'org-unit', we can write the following rule for AWS monitoring: EC2Instance should have Tags with [ Name eq 'orgunit' ]" and "We can use a single rule to detect violations of multiple tagging practices. E.g. rule EC2Instance should have Tags with [ Name eq 'orgunit' ] and Tags with [ Name eq 'owner' ]" demonstrating sophisticated tag identification policies.[22] Moreover, Auto-Remediation Direct Tag Assignment of the Auto-Remediation Framework demonstrates explicit tag assignment through CloudFormation: "Optionally, enter the Tags for your CloudFormation stack and click Next," and "acknowledge creating IAM resources and click Create stack," showing direct tag assignment functionality integrated into cloud resource deployment.[23]

73. As another example, the Netskope One Orchestrator implements systematic method-based cloud management: "The Netskope One Orchestrator provides a single point for policy

[22] https://community.netskope.com/security-posture- management-4/using-custom-rules-for-resource-tag-and- label-enforcement-5862.
[23] https://github.com/netskopeoss/CSPM-AWS-AutoRemediation

management across all components of the Netskope One platform" with methodical approaches to multi-cloud operations and systematic policy coordination frameworks.[24] "The 100% cloud-based console unifies management of SSE and SD-WAN across branches, remote sites, multi-cloud and remote users," serving as the comprehensive security manager platform with centralized management capabilities. *Id.* "The Netskope One Orchestrator … continuous adaptive trust-based policy controls extend effortlessly and consistently across" multiple services, providing global policy coordination for tag identification across multiple cloud platforms. *Id.*




By replacing outdated and fragmented networking and security services with Netskope One, your adoption of zero trust becomes exceptionally seamless as you gain secure access with unparalleled visibility, extensive context, and industry leading AI-powered data and threat protection.

On the network and infrastructure side, you benefit from a nimble and effortless deployment experience, exceptional ease of use, and painless troubleshooting with zero compromises.

One Engine >

One Client >

One Gateway >

One Network >

**One Console** ∨

The Netskope One Orchestrator provides a single point for policy management across all components of the Netskope One platform. The 100% cloud-based console unifies management of SSE and SD-WAN across branches, remote sites, multi-cloud and remote users, and provides a built-in SD-WAN controller that separates the control & data planes.

24 https://www.netskope.com/netskope-one

74. Netskope has been aware of the ’527 patent since at least November 21, 2025. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102.

75. Netskope has actively and willfully induced infringement of at least claim 1 of the ’527 patent since at least November 21, 2025, in violation of 35 U.S.C. § 271(b).

76. Netskope’s customers and end-users of the ’527 Accused Products directly infringe at least claim 1 of the ’527 patent, at least by using the ’527 Accused Products, as described above.

77. Since at least November 21, 2025, Netskope has knowingly induced infringement of at least claim 1 of the ’527 patent by customers and end-users of the ’527 Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and use of the ’527 Accused Products in the United States.

78. Netskope instructs customers and end-users, at least through its marketing, promotional, and instructional materials, to use the infringing ’527 Accused Products, as described in detail above. Netskope creates and distributes promotional and product literature for the ’527 Accused Products that is designed to instruct, encourage, enable, and facilitate the use of the ’527 Accused Products in a manner that directly infringes the ’527 patent. In particular, Netskope instructs end users on how to configure and use its CSPM service and/or product, including by providing a publicly available repository of source code, to automatically enforce one or more tags via Netskope’s CSPM Advanced Tag Policy Framework, as described above.

79. Netskope provides its customers and end-users with additional instructions that direct the customers and end-users to use the ’527 Accused Products in an infringing manner. Such instructions include, for example, data sheets, technical specifications, customer support services, product sheets, and technical support services.

80. Netskope contributed and is contributing to infringement of at least claim 1 of the ’527 patent, in violation of 35 U.S.C. § 271(c).

81. Netskope’s customers and end-users of the CSPM and/or Netskope One Orchestrator products and/or services directly infringe at least claim 1 of the ’527 patent, at least by using the ’527 Accused Products, as described in detail above.

82. Netskope contributes to infringement of the ’527 patent by offering to sell and selling in the United States the ’527 Accused Products and components thereof, including, for example, the ’527 Accused Products and associated software applications, hardware, and other services. Such components are substantial, material parts of the claimed inventions of the ’527 patent and have no substantial non-infringing use.

83. The CSPM and Netskope One Orchestrator products and/or services, and associated software applications, firmware, and other services supplied by Netskope are specially made and adapted for use in infringing the ’527 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

84. This description is based on publicly available information and a reasonable investigation of the structure and operation of Netskope’s products and services. Fortinet reserves the right to modify this description, including, for example, on the basis of information about Netskope’s products and services that it obtains during discovery.

85. Netskope is not, and has never been, licensed or otherwise authorized by Fortinet to practice the claims of the ’527 patent.

86. Netskope’s infringement has harmed and continues to harm Fortinet in an amount yet to be determined, of at least a reasonable royalty and/or the lost profits that Fortinet would have made but for Netskope’s acts of infringement.

87. Since at least November 21, 2025, Netskope has had actual knowledge of the ’527 patent and Netskope’s infringement thereof. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102. Thus, Netskope’s ongoing infringement of the ’527 patent has been willful.

88. Despite Netskope’s knowledge of the ’527 patent and its infringement thereof, Netskope has continued to make, use, sell, offer for sale, and/or import into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the ’527 patent, including but not limited to the Netskope ’527 Accused Products.

89. Netskope’s conduct in infringing the ’527 patent continues.

**COUNT THREE: INFRINGEMENT OF PATENT NO. 12,126,695**

90. Fortinet re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs of these claims as though fully set forth herein.

91. Fortinet is the current exclusive owner and assignee of all right, title, and interest in and to the ’695 patent, duly and legally issued by the United States Patent and Trademark Office, including the right to bring this suit for damages. *See* Exhibit 3.

92. The ’695 patent is valid and enforceable.

93. Netskope has directly infringed and continues to infringe the ’695 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the ’695 patent, including but not limited to Netskope Threat Exchange, Cloud Threat Exchange (CTE), Cloud Exchange, and related Netskope products and services, including Netskope’s Next Gen Secure Web Gateway (“NG SWG”) product, that are part of the Netskope Platform or Netskope Security Cloud (the “’695 Accused Products”). *See* Exhibit 7.

94. As a non-limiting example, Netskope has infringed at least claim 1 of the ’695 patent. Claim 1 claims as follows:

> 1. A method of learning from other cloud deployments to combat security threats, the method comprising:
>
> identifying, for at least a portion of a first cloud deployment, one or more additional cloud deployments to utilize for cross-customer learning;
>
> receiving information describing a security threat to one or more of the additional cloud deployments;
>
> receiving information describing configuration settings used to combat the security threat; and
>
> identifying, based on the information describing configuration settings used to combat the security threat, one or more configurations to adopt for the first cloud deployment.

95. The ’695 Accused Products practice “learning from other cloud deployments to combat security threats, comprising identifying, for at least a portion of a first cloud deployment, one or more additional cloud deployments to utilize for cross-customer learning; and receiving information describing a security threat to one or more of the additional cloud deployments.” For example, the Netskope One Platform includes Cloud Threat Exchange, which can share cloud threat intelligence between different cloud vendors.[25]

# Netskope Unveils Cloud Threat Exchange, Enabling Peer-to-Peer Sharing of Threat Intelligence in the Cloud

*A first of its kind, with Cloud Threat Exchange, technology vendors and customers can share cloud threat intelligence with each other to improve their overall threat prevention posture*

Cloud Threat Exchange features include:

- Facilitates the exchange of threat indicators between vendors, including file hashes, malicious URLs, and DLP file signatures, thus providing customers with fast, up-to-date protection across their security investments.
- Reduces time between new threat discovery and protection implementation, allowing organizations to keep up with the ever-evolving threat landscape.
- Establishes full IOC exchange with leading security providers, including endpoint detection and response, threat intelligence, managed detection and response, email security, and ticket management systems. Other vendors are easily added by customers or partners building their own plug-ins.
- Works with indicators delivered via STIX/TAXII standards enabling information sharing for real-time network defense.

[25] https://www.netskope.com/press-releases/netskope-cloud-threat-exchange; https://www.netskope.com/netskope-threat-labs; https://www.prnewswire.com/news-releases/netskope-unveils-cloud-threat-exchange-enabling-peer-to-peer-sharing-of-threat-intelligence-in-the-cloud-301123738.html.

SANTA CLARA, Calif., Sept. 3, 2020 /PRNewswire/ -- Netskope, the leading **security cloud**, today announced the **Cloud Threat Exchange**, one of the industry's first cloud-based solutions for the ingestion, curation, and real-time sharing of threat intelligence across enterprise security enforcement points. With this announcement, Netskope has made the Cloud Threat Exchange free and open to customers that wish to use the technology to collaborate on sharing indicators of compromise (IOCs). Any certified, partner, vendor, or customer may use Cloud Threat Exchange to automate the delivery and distribution of high-value, actionable threat intelligence, thus reducing the time to protection and eliminating gaps in coverage. Cloud Threat Exchange is supported by a wide range of members certified by Netskope, which include **VMware Carbon Black**, **CrowdStrike**, **Cybereason**, **Mimecast**, **SentinelOne**, and **ThreatQuotient**. Together, this ecosystem helps mutual customers maximize the benefit of their protections by leveraging threat intelligence across multiple enforcement points.

96. The ’695 Accused Products practice “receiving information describing configuration settings used to combat the security threat.” For example, the ’695 Accused Products include Netskope (or its customers) receiving “up-to-the-minute intelligence feeds that contain malicious URLs and file hashes” to integrate the same “into their security infrastructure products such as endpoints, firewalls, secure web-gateways, and cloud access security brokers.”[26]

Netskope Cloud Threat Exchange (CTE) is a near real-time threat ingestion, curation, and sharing tool that enables Netskope customers and technology partners to bi-directionally exchange IOCs. Security teams can integrate up-to- the-minute intelligence feeds that contain malicious URLs and file hashes into their security infrastructure products such as endpoints, firewalls, secure web-gateways, and cloud access security brokers. For workflow and playbook automation, CTE can also integrate with IR, SIEM, SOAR, or custom API-based tools.

[26] https://www.netskope.com/resources/data-sheets/netskope-cloud-threat-exchange; https://www.netskope.com/wp-content/uploads/2022/12/2023-11-Netskope-Cloud-Exchange-SB-505-4.pdf.

- Enable bi-directional threat intelligence sharing for Netskope solutions providing Advanced Threat Protection, including Next Generation Secure Web Gateway (NG SWG)
- Selectively manage timely indicators of compromise (IOCs) throughout your security stack including malicious URLs and file hashes
- Expands on pre-defined integrations for Netskope, Endpoint Security, Incident Response (IR), SIEMs, and other security solutions, plus define new custom integrations

**Netskope CTE supports automated bi-directional sharing of IOCs with multiple sources.**




**Trigger Workflows and Playbooks**

Pervasive attacks and their IOCs can trigger IR workflows or orchestration playbooks to automate response steps making security analysts more efficient across multiple security tools.

97. The ’695 Accused Products practice “identifying, based on the information describing configuration settings used to combat the security threat, one or more configurations to adopt for the first cloud deployment.” For example, the ’695 Accused Products include Netskope customers integrating the threat intelligence information received from other Netskope customers and/or cloud vendors; and the ’695 Accused Products “ingest[], manage[], and share[] [Indicators

of Compromise]" "including malicious URLs and file hashes[.]"[27] That information is then used by Netskope's NG SWG in the customer's real-time security enforcement.

> Netskope Cloud Exchange is essentially a large API broker with four separate modules based on the type of data you want to share throughout your security stack. The Cloud Threat Exchange module allows us to share file hash and URL indicators between different tools through plugins. At the time, there was no plugin specifically for connecting to a Feedly stream, so we developed a custom CTE plugin that allows us to ingest IoCs found in our Feedly stream and automatically add them to objects serving as blocklists in our Netskope tenant. While an initial time investment was required to curate our Feedly stream and build the plugin, in the long run, this frees up time our analysts can use to be proactive in other areas, such as engaging in threat hunts.

98. Netskope has been aware of the '695 patent since at least November 21, 2025. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102.

99. Netskope has actively and willfully induced infringement of at least claim 1 of the '695 patent since at least November 21, 2025, in violation of 35 U.S.C. § 271(b).

100. Netskope's customers and end-users of the Accused Products directly infringe at least claim 1 of the '695 patent, at least by using the '695 Accused Products, as described above.

101. Since at least November 21, 2025, Netskope has knowingly induced infringement of at least claim 1 of the '695 patent by customers and end-users of the Accused Products, including Cloud Threat Exchange, with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and use of the Accused Products, including Cloud Threat Exchange and/or Cloud Exchange, in the United States. For example, Netskope publishes instructions in its "knowledge portal" informing its customers to install, configure, and use the Cloud Exchange product and/or service according to the claims of the '695 patent, as described above.[28]

102. Netskope instructs customers and end-users, at least through its marketing, promotional, and instructional materials, to use the infringing '695 Accused Products, as described

---

27 https://www.netskope.com/resources/data-sheets/netskope-cloud-threat-exchange

28 https://docs.netskope.com/en/netskope-cloud-exchange/; https://docs.netskope.com/en/install-cloud-exchange.

in detail above. Netskope creates and distributes promotional and product literature for the Accused Products, including at least Cloud Threat Exchange and/or Cloud Exchange, that is designed to instruct, encourage, enable, and facilitate the use of the '695 Accused Products in a manner that directly infringes the '695 patent. In particular, Netskope's Knowledge Portal instructs end users on how to configure and use its Cloud Exchange service and/or product to use threat information from other public cloud deployments to configure their own cloud deployments with enhanced security based on configuration settings in that same threat information, as described above.[29]

103. Netskope provides its customers and end-users with additional instructions that direct the customers and end-users to use the '695 Accused Products in an infringing manner. Such instructions include, for example, data sheets, technical specifications, customer support services, product sheets, and technical support services.

104. Netskope contributed and is contributing to infringement of at least claim 1 of the '695 patent, in violation of 35 U.S.C. § 271(c).

105. Netskope's customers and end-users of the '695 Accused Products, including the Cloud Threat Exchange and/or Cloud Exchange products and/or services, directly infringe at least claim 1 of the '695 patent, at least by using the '695 Accused Products, as described in detail above.

106. Netskope contributes to infringement of the '695 patent by offering to sell and selling in the United States the '695 Accused Products and components thereof, including, for example, the Accused Products and associated software applications, hardware, and other services. Such components are substantial, material parts of the claimed inventions of the '695 patent and have no substantial non-infringing use.

107. The '695 Accused Products, including Cloud Threat Exchange and/or Cloud Exchange, and associated software applications, firmware, and other services supplied by Netskope, are specially made and especially adapted for use in infringing the '695 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

[29] *See* https://docs.netskope.com/en/cloud-exchange-supported-integrations.

108. This description is based on publicly available information and a reasonable investigation of the structure and operation of Netskope's products and services. Fortinet reserves the right to modify this description, including, for example, on the basis of information about Netskope's products and services that it obtains during discovery.

109. Netskope is not, and has never been, licensed or otherwise authorized by Fortinet to practice the claims of the '695 patent.

110. Netskope's infringement has harmed and continues to harm Fortinet in an amount yet to be determined, of at least a reasonable royalty and/or the lost profits that Fortinet would have made but for Netskope's acts of infringement.

111. Since at least November 21, 2025, Netskope has had actual knowledge of the '695 patent and Netskope's ongoing infringement thereof. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102. Thus, Netskope's ongoing infringement of the '695 patent has been willful.

112. Despite Netskope's knowledge of the '695 patent and its infringement thereof, Netskope has continued to make, use, sell, offer for sale, and/or import into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the '695 patent, including but not limited to the Netskope '695 Accused Products.

113. Netskope's conduct in infringing the '695 patent continues.

**<u>COUNT FOUR: INFRINGEMENT OF PATENT NO. 12,244,621</u>**

114. Fortinet re-alleges and incorporates by reference each of the allegations in the foregoing paragraphs of these claims as though fully set forth herein.

115. Fortinet is the current exclusive owner and assignee of all right, title, and interest in and to the '621 patent, duly and legally issued by the United States Patent and Trademark Office, including the right to bring this suit for damages. *See* Exhibit 4.

116. The '621 patent is valid and enforceable.

117. Netskope has directly infringed and continues to infringe the '621 patent by making, using, selling, offering for sale, and/or importing into the United States, without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more

claims of the ’621 patent, including but not limited to the Netskope Shadow IT, Cloud Access Security Broker (CASB), and related Netskope products and services that are part of the Netskope Platform or Netskope Security Cloud (the “’621 Accused Products”). *See* Exhibit 8.

118. As a non-limiting example, Netskope has infringed at least claim 1 of the ’621 patent. Claim 1 claims as follows:

> 1. A method of using activity monitored by multiple data sources to identify shadow systems, the method comprising:
>
> gathering, from one or more resources or providers of the one or more resources, first information describing access to the one or more resources by one or more user devices of a user;
>
> gathering, from one or more client applications of at least a subset of the one or more user devices, second information describing access to the one or more resources; and
>
> identifying one or more shadow systems based on a discrepancy between the first information and the second information, wherein the one or more shadow systems comprise one or more of the at least a subset of the one or more user devices engaging in shadow information technology (IT) activity, wherein identifying the one or more shadow systems comprises identifying one or more accesses described in the first information but not described in the second information and identifying, as one or more shadow systems, one or more user devices corresponding to the one or more accesses.

119. The ’621 Accused Products practice “using activity monitored by multiple data sources to identify shadow systems including gathering, from one or more resources or providers of the one or more resources, first information describing access to the one or more resources by one

or more user devices of a user." For example, the Netskope One Platform uses API connectors to gather data from managed cloud apps.[30]

> Use API connectors to connect the Netskope One Platform to managed cloud apps like Microsoft 365, Box, Salesforce, Google Workspace, AWS, and more.
>
> An API deployment provides out-of-band visibility and control of data at rest in managed cloud apps and is also required for IaaS continuous security assessment functionality.
>
> - Protects data at rest in cloud apps managed by IT
> - Enables policy actions such as remove public shares and restrict sharing of certain content to internal
> - Out-of-band deployment
> - Dozens of API connectors supported

> Netskope is deployed inline for millions of managed devices worldwide, with our secure web gateway monitoring cloud and web activity to secure our customers and their data. Netskope Threat Labs leverages anonymized usage data collected from the Netskope Security Cloud platform to gain visibility into cloud app usage on managed devices. Each month, we count the total number of distinct cloud apps in use in each organization and compute the average across all organizations of similar size, using the following bins:

120. The '621 Accused Products practice "gathering, from one or more client applications of at least a subset of the one or more user devices, second information describing access to the one or more resources." For example, Netskope's platform, including its Cloud Access Security Broker (or "CASB"), collects user data, including data regarding user access to web, cloud, and private apps.[31]

---

[30] https://www.netskope.com/products/deployment-options; https://www.netskope.com/blog/cloud-and-threat-report-shadow-it-in-the-cloud.

[31] https://www.netskope.com/netskope-one; https://www.netskope.com/wp-content/uploads/2024/05/2025-03-Netskope-Client-DS-509-11.pdf; https://www.netskope.com/products/casb; https://www.netskope.com/wp-content/uploads/2022/10/2024-05-Netskope-CASB-DS-550-6.pdf.




Netskope's CASB, cloud access security broker, solution empowers organizations to quickly identify and oversee the use of cloud applications, whether they are managed by IT or unmanaged and used as shadow IT. The deep visibility into your entire SaaS and IaaS estate prevents sensitive data exposure by inadvertent oversharing and exfiltration from your corporate environment by risky insiders or malicious cybercriminals.

**Simplify traffic steering to accelerate cloud security adoption**

- **Ease of deployment:** Lightweight client with extensive platform support combined with simple, low-touch provisioning for deployment at scale
- **Flexible configuration:** Supports Transport Layer Security (TLS) and performance-optimized Datagram Transport Layer Security (DTLS) tunnels with granular control by user, app, group, and predefined exceptions
- **Integrated security:** Client-based notifications for security awareness coaching, tamper-proof installation, device posture checks, and integration with leading endpoint technologies
- **Supports hybrid work:** Addresses users accessing from anywhere, whether remote or on-premises, including dynamic steering options
- **End-to-end visibility:** Provides comprehensive insight into user traffic, from device to application, ensuring better performance monitoring and security enforcement

121. The '621 Accused Products practice "identifying one or more shadow systems based on a discrepancy between the first information and the second information, wherein the one or more

shadow systems comprise one or more of the at least a subset of the one or more user devices engaging in shadow information technology (IT) activity, wherein identifying the one or more shadow systems comprises identifying one or more accesses described in the first information but not described in the second information and identifying, as one or more shadow systems, one or more user devices corresponding to the one or more accesses." For example, the Netskope One Platform collects data on "unmanaged app and cloud services," (*i.e.*, Shadow Systems or one or more user devices engaging in shadow information technology activity).[32]




[32] https://www.netskope.com/solutions/unmanaged-cloud; https://www.netskope.com/blog/critical-casb-use-cases-market-today-monitor-control-users-activities-even-accessing-cloud-services-mobile-app-desktop-native-app.

## Understand your unmanaged cloud use and risks

**Full visibility**

Granular control

Data protection

Compliance

Vendor assurance

Gain full visibility of your cloud services with an all-mode architecture capable of covering all cloud traffic, whether your users are on-premises or remote, using a web browser, mobile app, or sync client.

Assess enterprise readiness of your cloud services with our objective CCI ratings and calculate risk scores based on your organization's usage.

- See traffic from managed or unmanaged apps and cloud services
- Gain visibility whether users are on premises or remote
- Cover browsers, sync clients, and mobile apps
- Assess cloud services' enterprise readiness, based on 50+ CSA objective attributes

Full visibility

Granular control

Data protection

**Compliance**

Vendor assurance

Maintain detailed audit trails of all cloud activities, and ensure compliance by governing access to your cloud services based on deep cloud context.

Enforce granular, activity-level or data-level policies to safely enable cloud services, while complying with regulations. Leverage a common console and unified policies across managed apps, unmanaged apps, and web traffic in one solution.

- Audit and track all app and cloud service activities
- Detect non-compliant activities and behavioral anomalies
- Leverage CCI risk ratings to assess compliance readiness
- Enforce granular controls to ensure compliance

> One critical difference between Netskope and other CASBs is that we enable the use case of monitoring activity and enforcing policy controls over sanctioned and unsanctioned cloud services EVEN when users are accessing the service from a mobile app or desktop native app. Consider a policy that you may have in place that states: "During our company's financial quiet period, we prefer that corporate 'insiders' do not share content outside of the company from any Cloud Storage application" (you may even stipulate that if they do, they need to write a short business justification for later audit purposes). If you do not have controls in place over remote and mobile access, then it would be very easy for users to bypass your policy. However, Netskope customers are able to enforce this kind of policy, and often do so in order to ensure thorough policy controls over nonpublic financial information, intellectual property, and sensitive or regulated user or customer data.

122. Netskope has been aware of the '621 patent since at least November 21, 2025. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102.

123. Netskope has actively and willfully induced infringement of at least claim 1 of the '621 patent since at least November 21, 2025, in violation of 35 U.S.C. § 271(b). Netskope's

customers and end-users of the Accused Products directly infringe at least claim 1 of the ’621 patent, at least by using the ’621 Accused Products, as described above.

124. Since at least November 21, 2025, Netskope has knowingly induced infringement of at least claim 1 of the ’621 patent by customers and end-users of the ’621 Accused Products with specific intent to induce infringement, and/or with willful blindness to the possibility that its acts induce infringement, through activities relating to selling, marketing, advertising, promotion, support, and use of the ’621 Accused Products in the United States. For example, Netskope publishes instructions in its “Knowledge Portal” informing its customers to install, configure, and use the Netskope Shadow IT, Cloud Access Security Broker (CASB), and related Netskope products and services that are part of the Netskope Platform or Netskope Security Cloud, and other ’621 Accused Products to detect unmanaged, or “shadow” systems, apps, and cloud services, according to the claims of the ’621 patent, as described above.[33]

125. Netskope instructs customers and end-users, at least through its marketing, promotional, and instructional materials, to use the infringing ’621 Accused Products, as described in detail above. Netskope creates and distributes promotional and product literature for the Accused Products, including at least CASB and Netskope One, that is designed to instruct, encourage, enable, and facilitate the use of the ’621 Accused Products in a manner that directly infringes the ’621 patent. For example, Netskope’s “Knowledge Portal” instructs end users on how to configure and use its Device Intelligence service and/or product to block unsecured devices on networks of other, known, devices attempting to access a customer’s network, as described above with reference to the claims of the ’621 patent.[34]

126. Netskope provides its customers and end-users with additional instructions that direct the customers and end-users to use the ’621 Accused Products in an infringing manner. Such instructions include, for example, data sheets, technical specifications, customer support services, product sheets, and technical support services.

[33] *See also* https://docs.netskope.com/en/shadow-it-identifying-unsanctioned-aws-accounts-using-advanced-analytics/.

[34] *See* https://www.netskope.com/blog/theres-no-such-thing-as-shadow-it-its-business-it.

127. Netskope contributed and is contributing to infringement of at least claim 1 of the ’621 patent, in violation of 35 U.S.C. § 271(c).

128. Netskope’s customers and end-users of the ’621 Accused Products directly infringe at least claim 1 of the ’621 patent, at least by using the ’621 Accused Products, as described in detail above.

129. Netskope contributes to infringement of the ’621 patent by offering to sell and selling in the United States the ’621 Accused Products and components thereof, including, for example, the Accused Products and associated software applications, hardware, and other services. Such components are substantial, material parts of the claimed inventions of the ’621 patent and have no substantial non-infringing use.

130. The ’621 Accused Products and associated software applications, firmware, and other services supplied by Netskope are specially made and especially adapted for use in infringing the ’621 patent and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

131. This description is based on publicly available information and a reasonable investigation of the structure and operation of Netskope’s products and services. Fortinet reserves the right to modify this description, including, for example, on the basis of information about Netskope’s products and services that it obtains during discovery.

132. Netskope is not, and has never been, licensed or otherwise authorized by Fortinet to practice the claims of the ’621 patent.

133. Netskope’s infringement has harmed and continues to harm Fortinet in an amount yet to be determined, of at least a reasonable royalty and/or the lost profits that Fortinet would have made but for Netskope’s acts of infringement.

134. Since at least November 21, 2025, Netskope has had actual knowledge of the ’621 patent and Netskope’s ongoing infringement thereof. *See* Case No. 4:25-cv-02360-HSG at Dkt. 102. Thus, Netskope’s ongoing infringement of the ’621 patent has been willful.

135. Despite Netskope’s knowledge of the ’621 patent and its infringement thereof, Netskope has continued to make, use, sell, offer for sale, and/or import into the United States,

without authority, products, methods performed by and/or attributable to equipment, and/or services that practice one or more claims of the ’621 patent, including but not limited to the Netskope ’621 Accused Products.

136. Netskope’s conduct in infringing the ’621 patent continues.

**PRAYER FOR RELIEF**

WHEREFORE, Fortinet respectfully requests:

1. That Judgment be entered that Netskope has infringed one or more of the Asserted Patents, directly and/or indirectly, by way of inducement or contributory infringement, literally or under the doctrine of equivalents;

2. That, in accordance with 35 U.S.C. § 283, Netskope and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, including partners, distributors, resellers and customers, be permanently enjoined from (1) infringing the Asserted Patents and (2) making, using, selling, offering for sale and/or importing any products and/or services that infringe the Asserted Patents;

3. An award of damages sufficient to compensate Fortinet for Netskope’s willful infringement under 35 U.S.C. § 284;

4. That the case be found exceptional under 35 U.S.C. § 285 and that Fortinet be awarded its attorneys’ fees;

5. Costs and expenses in this action;

6. An award of prejudgment and post-judgment interest; and

7. Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Fortinet, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED: August 25, 2026

**GISH PLLC**

By */s/ Ryan Iwahashi*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
David A. Nelson (IL Bar No. 6209623; *pro hac vice*)
davidnelson@quinnemanuel.com
Athena D. Dalton (IL Bar No. 6326790; *pro hac vice*)
athenadalton@quinnemanuel.com
Harrison Rose (IL Bar No. 6327523; *pro hac vice*)
harrisonrose@quinnemanuel.com
Luiz Miranda (IL Bar No. 6328766; *pro hac vice*)
luizmiranda@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Tel: (312) 705-7400

Alexander Rudis (NY Bar No. 4232591; *pro hac vice*)
alexanderrudis@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849 7000

Jeff Gerchick (DC Bar No. 474529; *pro hac vice*)
jeffgerchick@quinnemanuel.com
1300 I Street NW Suite 900
Washington, D.C. 20005
Tel: (202) 538 8000

Andrew M. Holmes (Bar No. 260475)
drewholmes@quinnemanuel.com
Ognjen Zivojnovic (Bar No. 307801)
ogizivojnovic@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Tel: (415) 875-6600

Justin Sorensen (Bar No. 324817)
justinsorensen@quinnemanuel.com
2755 E Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Tel: (801) 515-7320

**GISH PLLC**
Ryan Iwahashi (CA SBN 284766)
ryan@gishpllc.com
50 California Street, Suite 1500
San Francisco, CA 94111
Phone: (415) 630-2000

Andrew D. Gish (NY SBN 4918454) *(pro hac vice)*
andrew@gishpllc.com
Christopher Gerson (NY SBN 4595708) *(pro hac vice)*
chris.gerson@gishpllc.com
Josef Schenker (NY SBN 4935185) *(pro hac vice)*
josef.schenker@gishpllc.com
41 Madison Avenue, Floor 31
New York, NY 10010
Phone: (212) 518-7380

*Attorneys for Fortinet, Inc.*

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule 5-1, I hereby certify that, on August 25, 2026, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system and email.

DATED: August 25, 2026

By: *__/s/ Ryan Iwahashi__*